The counsel for the respective parties in this case have submitted voluminous papers and elaborate briefs in support of, and in opposition to, a motion for a re-argument. In the notice of motion, numerous grounds for a rehearing are to be found, but only one of them need be considered. That is, that the court, in the decision of the case, has overlooked certain constitutional and statutory provisions relating to the visitorial power of the board of charities, through the inadvertence of counsel. Upon this ground, substantially every feature of the case has been presented for the second time. On many of the points the prevailing opinion of this court is quoted, not to show that the particular point was overlooked, but that our conclusion was wrong in point of law. The whole discussion resolves itself, in the end, into the inquiry: what is a charitable institution within the meaning of the Constitution and the statutes. When that term, as used in the Constitution, is defined, the controversy is settled, since the statutes are no broader than the Constitution, and whatever construction is to be placed upon the fundamental law, the same construction would follow with respect to the same terms when used in the statute. The brief upon this motion is signed by the attorney-general and his predecessor in office, who appeared as counsel in the case, and also by two other distinguished members of the bar who did not participate in the original argument. It is somewhat remarkable that in all the discussion upon the only question in the case the counsel have not attempted to furnish a definition of a charitable institution, as that term is used in the Constitution. All must admit that it does not include every corporation or society that has some charitable feature or is engaged in some good work, but that the meaning of those terms must be limited. This much, it is safe to premise, has already been demonstrated and *Page 431 
must be conceded. Assuming that this proposition is beyond dispute, the question is, and always has been, where is the line to be drawn? The learned counsel who have presented the brief in support of this motion have not attempted to draw it. It is true that they earnestly contend that this court, in the decision of the case, has drawn the line at the wrong point, but they have not attempted to inform us at what other point it should be placed. They evidently have contented themselves with attempting to show that wherever it is drawn this defendant should be included within the powers of the board of charities.
It is quite obvious, however, that if any limitations at all are to be placed upon those powers the language of the Constitution must be construed by some reasonable rule or upon some rational principle. We have attempted to do that by holding that a charitable institution must be one that in some form or to some extent receives public money for the support and maintenance of indigent persons. By public money is meant money raised by taxation not only in the state at large but in any city, county or town. The adoption of this principle will permit the board to visit, inspect and regulate every institution in the state, public or private, where children or adults are supported or maintained, in whole or in part, by the use of public money, and every institution, public or private, where children or adults are sent or detained for support or maintenance in pursuance of any law. But we are informed by the papers upon this motion that this rule would deprive the board of jurisdiction over half the charitable institutions in the state. The papers presented in opposition to this motion show that the institutions thus excluded, with the exception, perhaps, of about half a dozen, have never been visited by the board in the past; and obviously, if it be true, as the relator asserts, that there are over twelve hundred charitable institutions in the state, it would be impossible to exercise the power of visitation by the board with respect to all of them in any one year. There must, in the nature of things, be a distinction in this respect between private institutions *Page 432 
receiving public money in some form or in some measure as charity and the same class of institutions that do not. This may be illustrated by reference to a class of institutions mentioned in the moving papers. We will suppose that a private individual is wealthy and benevolent enough to found and endow a private hospital. When complete the building and everything in it is his private property. No one is compelled by any law to go there or remain there, and the founder is under no legal obligation to receive patients. It is purely a private concern, and it is difficult to understand upon what legal ground the state can claim the right to inspect his books, or to make rules and regulations for the transaction of the business. There must be some limit to the power of government to interfere in purely private affairs; and what is true of a hospital is equally true of many of the other private institutions referred to in the moving papers. But when any of these institutions become, in any form or to any extent, the recipients or beneficiaries of public money as charity, there is a just and reasonable ground upon which the state may claim the right of visitation. And it is by the application of this principle that a charitable institution, as used in the Constitution, is to be defined and understood.
It was upon this principle that the decision in this case attempted to define what is and what is not a charitable institution. We are satisfied, upon further examination of the case, that the rule adopted is not only just and reasonable in itself, but it was the principle which the convention intended to engraft upon the Constitution, and this really presents the only disputed question of law in this case. The learned counsel for the relator do not assent to this construction. Their position to the contrary is distinctly stated in the moving papers in these words: "The main purpose and intention of the constitutional provisions and the statutory enactment are not so much to supervise the pecuniary affairs of institutions as to provide for an inspection of the management of the institutions and to see that the inmates are properly treated, and, if not, so to secure the correction through due process of *Page 433 
law of whatever abuses, evils or defects which may be found to exist." It is not very easy to see how the state can examine into the evils or correct the abuses in a purely private unincorporated institution to which no one could be sent, or in which no one can be detained by any law, and where the inmates may come and go at pleasure. If the framers of the Constitution had any such purpose in mind it is remarkable that no trace of it is to be found and no reference was made to it in the proceedings and debates upon those provisions of the Constitution relating to charities. The proceedings of the convention do not disclose any purpose to interfere with private institutions that were not in any form, or to any extent, the beneficiaries of public money. I refer, of course, to those private institutions that admit or care for children or adults without any compensation from the public and where the inmates are in the institution solely by their own volition. If the inmates in these institutions are not properly treated they are not obliged to stay there or to go there. If they are detained there against their will the process of the courts is open to them to secure their enlargement or liberation. If a mere private institution is not properly managed in the opinion of the board of charities it would be difficult, I think, to point out any law which confers power upon the board to change the management. It is safe for the courts to assume that such institutions, depending on the patronage of the public, will be interested to merit it by such a management of their affairs as will commend them to the confidence of their patrons, and that if they fail to treat the inmates properly they will not go there voluntarily or remain when there. The perfect liberty of action which the inmates enjoy, and the promptings of self-interest on both sides, will regulate private charity without any governmental interference. There is nothing in the proceedings of the convention to warrant us in holding that there was any purpose to subject purely private institutions which cared for or maintained those indigent adults or children who voluntarily seek such places as homes or remain there voluntarily to state inspection or regulation. *Page 434 
The purpose which the learned counsel for the relator now claim was in the mind of the convention is nowhere expressed in the proceedings of that body, and there was no public demand for any change in that respect.
On the contrary, the purpose of regulating the expenditure of public money for charity was stated and avowed by nearly every member that spoke on that subject, and in all the written records of that body. The article of the Constitution now under consideration was reported from the committee on charities by the chairman, Mr. Lauterbach, on the 2d of August, 1894. It was accompanied by an elaborate report in writing, and it is only necessary to read it in order to ascertain the underlying purpose in view. When the convention was about to adjourn on the 29th of September, 1894, the president, Mr. Choate, delivered an address, which was evidently the result of reflection, if not of careful preparation. On the subject now under consideration he said: "There was another subject which deeply agitated the minds of the people of this state, and that was the application of public money in the way of private charity. By many who had not carefully examined the subject it was believed to be inherently an evil which could only be cured by cutting it out by the roots. We have, through our charities committee, most carefully examined that question, and I think we came to the conclusion that the system which the state had deliberately adopted and carefully followed now for more than twenty years, of employing the aid of honest, faithful, devoted private charitable institutions for the care of certain wards of the state that could not otherwise be as well cared for, ought not to be departed from; but, at the same time, there were abuses incident to the conduct of that mode of charity which at least there should be a stop put to, and we have deprived the legislature of the compulsory power in the matter. Hereafter, if this constitution is adopted, no subordinate division of the state can be compelled, by the central power of the state, to devote a dollar of its money, against its will, to any particular form of charity. Besides that we have secured the regulation of the state board *Page 435 
of charities to this effect: that wherever any public money is devoted to a private charity for the public service it shall continue under public control, and the vigilant eye and the strong arm of the people shall be able to follow every dollar of the public money into every institution to which it is so devoted."
Before the adjournment, the convention appointed a committee to prepare a public address to the people in order to inform them before the election with respect to the purpose and scope of the changes made in the fundamental law. That committee was composed of some of the most prominent members of the convention, including the president. The question of charities was referred to in this address in the following language:
"We have required the legislature to provide for free public schools in which all of the children of the state may be educated; and we have prohibited absolutely the use of public money in aid of sectarian schools. We have provided also for regulating and limiting the payment of public money to private institutions for the support of the poor by depriving the legislature of the power to pass mandatory laws requiring such payments from counties, cities, towns and villages, and by subjecting such expenditures to the control of the State Board of Charities."
These statements from the highest and most authoritative sources indicate very clearly what the purpose of the convention was, and in the light of that purpose we may safely interpret the meaning of the language employed. The purpose was to safeguard the expenditure of public money for the support and maintenance of indigent persons in public or private institutions; and hence the language employed should be made subservient to that purpose. It is reasonable, therefore, to conclude that when the framers of the Constitution spoke of charitable institutions they intended to designate only such as were within the scope of the reform. So long as we give effect to the Constitution, according to the spirit and purpose in which it was framed by the convention and *Page 436 
adopted by the people, it is safe to conclude that the decision rests on reasonable grounds.
There is no distinction, we think, between a charitable institution and an eleemosynary one. The two words are used interchangeably and express substantially the same idea. Nor do we think that the suggestion that the defendant, if not a charitable institution, is a reformatory or a correctional one, has any substantial foundation. The defendant is not a correctional or a reformatory institution, unless, indeed, in the same sense that the police department or the police courts are. Much emphasis is placed upon the circumstance that the defendant, under a special statute, may be appointed guardian of a minor child. We assume that many trust companies and other corporations have been given the like capacity, but the fact that they possess such power does not prove or tend to prove that they are charitable institutions. It is said that this case is of great public importance, and in view of this suggestion we have carefully considered all that has been submitted in support of the motion, but we see no reason to change our views with respect to the proper decision of the case.
The motion for a reargument should, therefore, be denied, with ten dollars costs.
PARKER, Ch. J., GRAY and BARTLETT, JJ., concur; HAIGHT, MARTIN and VANN, JJ., dissent from opinion, but concur in result upon the ground that there is no reason for a reargument.
Motion denied. *Page 437