**GRIGALAUSKAS et al. v.
UNITED STATES.**

Civ. A. 50–18.

United States District Court
D. Massachusetts.

May 3, 1951.

Jules E. Angoff, Boston, Mass., for plaintiff.

George Garrity, U.S. Atty., Edward O. Gourdin, Asst. U. S. Atty., Boston, Mass., for defendant.

McCARTHY, District Judge.

This is a suit under the Federal Tort Claims Act, 28 U.S.C.A. § 2671, et seq., arising out of alleged negligent treatment in an Army Station Hospital of a dependent child of an enlisted man of the Regular Army on active duty. The child is suing, through her father as a next friend, for damages. The father seeks consequential damages. The gist of the complaint is that the child was born in the Station Hospital at Fort Leavenworth, Kansas, and in the course of post-natal care at the hospital, she suffered injuries through the negligence of the Army doctor in attendance, who, when she was experiencing difficulty in breathing, administered an injection twenty times normal strength which caused skin and tissue of the lower back region to slough off and left a mass of scar tissue there.

The defendant earlier filed a motion to dismiss the complaint on the ground that the practice of providing medical care to the mother and the plaintiff child was a mere discretionary function, and that the defendant is expressly exempted from liability in such cases under the first exception to the Act. 28 U.S.C.A. § 2680(a). The court ruled that the defendant had already exercised its discretion by admitting the plaintiff to medical service, and denied the motion.

The case has been heard on testimony, deposition and arguments of counsel, and after mature deliberation I find the following facts:

1. In November of 1947, the Fort Leavenworth Station Hospital, Kansas, was a hospital owned by the United States of America, and operated by its Army. No profit, in the form of money, was realized as a result of its operation. Funds for its operation found their source in the Treasury of the United States. Persons who were admitted to the hospital for treatment and care were those only who qualified for admission under then current Army regulations. These persons paid no money for board or for medical service received.

2. The minor plaintiff's father, Master Sergeant Joseph George Grigalauskas, was assigned to duty at Fort Leavenworth, Kansas, in November of 1947. His wife Edna, who had received pre-natal care at other Army hospitals, was admitted to the Station Hospital at Fort Leavenworth under the provisions of Army Regulations 40–505 and 40–590 on November 11, 1947. She was placed under the care of First Lieutenant George J. Hopkins, Chief of Obstetrics and Gynecology. The minor plaintiff was born on November 11, approximately two months prematurely. She was placed in an incubator, and remained in the hospital under

the care of the defendant until January 15, 1948.

3. On November 16, 1947, the infant developed dyspnea or labored breathing. She then lapsed into alternate periods of no breathing with short breaths between. Lieutenant Hopkins, called from his home, examined the baby and determined that there was some dehydration. He ordered a nurse of the defendant to go to "Medical Supply" and get an ampule of "Ringer's Lactic Solution". He administered ten cubic centimeters of the fluid from the ampule handed him by the nurse into the area over the lower part of the child's back. This was a concentrated solution. In his deposition the doctor admitted that he failed to read the label on the ampule which stated that the fluid was to be diluted one to twenty parts sterile water. [Deposition, Hopkins, Pg. 5] Doctor Hopkins, during the taking of the deposition, gave the following answers to questions put to him by counsel for the plaintiff, no objection being made to the questions:

"Q. Do you, Doctor, know the probable consequences to human tissues by injecting or administering undiluted Hartman's Ringer's Solution of 10 cc's? A. Oh, yes.

"Q. And what would the probable consequences of such an injection be by the destruction of the tissues in the immediate area? A. Oh, a destruction of tissues in the immediate area. It would destroy the skin and flesh underneath the skin in the area where it was injected.

"Q. Is there also a likelihood of it destroying the bone structures in the immediate area? A. No.

"Q. There isn't any question, doctor, that the injection of Hartman's Ringer's Solution to the child's lower back area was the sole cause of the skin in that back area sloughing off? A. No. [Deposition, Hopkins, Pg. 8, 9].

4. On November 16, 1947, the area injected with the hypertonic solution became discolored and the skin began to slough off. [Deposition, Hopkins, Pg. 17]. The wound was treated with alternating penicillin packs and lyosite. There was a "certain amount of purulent drainage from the wound". On December 20 plastic surgery was attempted. Granulation tissues over the area were removed, skin margins were undermined and were brought together and sutured. On December 23 a pyocyaneous infection developed in the wound, the sutures broke and the skin margins separated. After the infection had been aborted, the wound went on to heal over. On January 15, 1948, the baby was discharged from the hospital.

5. I find that the child has an extensive disfiguring and deforming scar running laterally across the lower area of the back. It extends out and parallel to the iliac crest on each side, the total length of the scar being 9 or 10 inches. From the lower end of the scar there is a linear scar extending to the anal margin. The tissues adjacent to it overhang in large folds creating an abnormal contour. She stands in "fatigue" posture, with an increased curve in the lumbar region, flat chest and protruding abdomen. As she stands, the unyielding scar tissue which adheres to the fascia over the sacrum forms a cleft accentuated by protruding buttocks. The scar tissue is inelastic, and because it is adherent to the bony element beneath the skin—a permanent condition—she shows a limitation of motion in the lower spine element. She walks with a peculiar gait, "waddles" while she runs, and accomplishes a range of 50 degrees only when bending and extending.

6. The plaintiff child will require plastic surgery operations in the future, perhaps as many as four. Such operations will have desirable cosmetic effects, relieving the "cleft" appearance in the lower back, but they will not restore mobility between the lower spine and the sacrum. She will always have considerable scarring. Her physical activity will be limited substantially. She will never be able to sit down comfortably. She will have difficulty in any activity which requires flexion of the lower back. She will not be able to participate in sustained physical sports. She will have great difficulty in child bearing. As she matures she will become more conscious of

her deformity, and will have difficulty with psychological factors of adjustment.

7. The mother of the child has testified that prior to the commencement of suit, the father had expended about $150 for doctors' fees. With respect to the future, there has been evidence that the series of plastic surgery operations, dressings, post-operative care and hospitalization will cost a minimum of $2500, a maximum of $10,000.

8. The minor plaintiff is now three and a half years of age. The probabilities are that, conceding the success of the proposed surgery, her permanent disability will preclude her from employment. She will suffer pain as a result of the proposed operations and mental anguish while experiencing unavoidable psychological difficulties. Taking into consideration all of the foregoing facts, I conclude that the failure of the doctor to note and to heed the instructions on the label of the ampule to dilute the contents with water at a ratio of one to twenty, prior to injecting the fluid into the area over the lower part of the minor plaintiff's back, was negligence on the part of agents or employees of the government at the hospital; that this neglect is the sole proximate cause of the damages sustained by the minor plaintiff and her father. It was stipulated that any amount recoverable by the father for consequential damages should be included in the award to the minor plaintiff. An appropriate verdict inclusive of any claim for consequential damages is $94,650.

As a matter of law I rule that this court has jurisdiction of the subject matter and of the parties; that the minor plaintiff's action is brought properly under the Federal Tort Claims Act, 28 U.S.C.A. § 2671, et seq.; that the father's action for consequential damages is brought properly; that none of the exceptions enumerated in 28 U.S. C.A. § 2680 exclude the claims of the plaintiffs; and that the United States, if a private person, would be liable to the plaintiffs, in accordance with the law of Kansas, where the act occurred. The reasons for these conclusions are set forth below. Judgment will be presented and entered in conformity with these findings and conclusions.

This case is clearly not the usual type of action brought under the Federal Tort Claims Act, 28 U.S.C.A. § 2671, et seq.

The defendant has argued that the court is without jurisdiction to adjudicate the claims asserted in the complaint, by reason of the provisions of Title 28, U.S.C.A. § 2680(a) which reads: "The provisions of this chapter and section 1346(b) of this title shall not apply to—(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." As stated herein before, the defendant earlier brought a motion to dismiss the complaint, contending that this subsection applies. The motion was denied on June 19, 1950, the court stating in its memorandum that the facts in the case are squarely on all fours with those in a case decided by the United States Court of Appeals for the Fifth Circuit, Costley v. United States, 5 Cir., 181 F.2d 723.

Congress has denied jurisdiction to the district courts for the adjudication (1) of any claim based upon an act or an omission of a government employee in the execution of a statute or regulation exercising due care, whether or not the statute or regulation is valid, and (2) of any claim based upon the performance or failure to perform a discretionary function or duty on the part of a government agency or employee, whether or not the discretion involved be abused. Sickman v. United States, 7 Cir., 184 F.2d 616, 619.

It is provided by Federal law, 10 U.S. C.A. § 96 that medical officers of the Army shall give medical services free of charge to the families of soldiers whenever practicable. Pursuant to this law, Army regulations, AR 40–590 and AR 40–505 provide that when suitable facilities for hospitalization are available for their care, wives and dependent children of soldiers may be ad-

mitted to hospitals provided they reside in the homes of such Army personnel and are not legally dependent upon an individual not in military service.

■ Mrs. Grigalauskas was authorized and entitled to receive medical attention where available. The hospital authorities made the determination that she should be admitted. The child was born to her while she was a patient in the hospital. The activity of the physicians and others at the hospital attending Mrs. Grigalauskas and the child was therefore "in the execution of a statute or regulation". Hence the claims would fall within the first exception stated in Sec. 2680(a), were it not for the fact that, by the terms of the Act, such claims are not barred unless the employee of the Government was in the exercise of due *care*. This employee was not in the exercise of due care.

The defendant contends, however, that the complaint falls within the second exception of Sec. 2680(a) as a claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of * * * an employee of the Government".

In Denny v. United States, 5 Cir., 171 F. 2d 365, it was pointed out that the United States is under no obligation to provide medical service. In that case the government refused to admit the dependent of a soldier to hospital care, and a complaint based upon the Tort Claims Act was dismissed, the court ruling that the government was exercising its discretion when it refused to admit Mrs. Denny, since the Army regulations allow the hospital authorities to make the preliminary determination whether suitable facilities are available for care.

In Costley v. United States, supra, [181 F.2d 724.] as in this case, a dependent of a soldier, having been admitted to an Army hospital, sustained personal injury by reason of alleged negligence in the administration of a drug. The Circuit Court of Appeals for the Fifth Circuit decided that the employees of the Government were "not exercising a discretionary function because

they had already exercised their discretion by admitting her into the hospital, and once having admitted her and undertaken the delivery of her child, they were under a duty to attend and treat her."

Despite the striking similarity of the facts in this case to those in the Costley case, the defendant presses the argument that the claims are barred by reason of the second exception. It contends that the hospital authorities *exercised* a discretionary function in making the determination that it was practicable to admit Mrs. Grigalauskas to medical treatment and in admitting her. This is so under the authority of the Denny decision. However, says the defendant, the medical treatment given to Mrs. Grigalauskas and the minor plaintiff subsequently was in the *performance* of the discretionary function. This contention, it is assumed, was not considered by, nor urged before the Court of Appeals in the Costley case, nor this court when considering the motion to dismiss.

■ An exception which reserves a part of immunity should be construed liberally in favor of the Government, Kendrick v. United States, D.C., 82 F.Supp. 430, 431, but the hair-splitting construction urged here is not logically sound. The defendant searches for a distinction where none is to be found. The nouns "exercise" and "performance" are practically synonymous, as used in the statute. If we are to distinguish them, it would be well to employ the word "exercise" when concerned with a duty or an activity which is performed habitually, and the word "performance" when concerned with a function which is not the subject of habit.

■ The Army Regulations allow the hospital authorities an exercise of discretion only in determining whether the dependent should be admitted. Once the patient has been admitted, the discretionary function has been completed.

Counsel for the Government presses another, and a novel contention: that the relationship between the Government and Master Sergeant Grigalauskas, a member of its armed forces, is "distinctively feder-

al in character"; that the dependent wife and child of the sergeant are a part of this federal status; that the serviceman himself would "have no right to sue on such a claim"; that, the rights and privileges of the wife and child being derived from the serviceman's status, they, therefore, have no right to sue on such a claim. The argument concludes that the action for consequential damages must also fail.

The United States Supreme Court, in one opinion, Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152, considered three cases arising under the Federal Tort Claims Act, and decided that the Act does not extend its remedy to servicemen who, while on active duty and while not on furlough, sustain injury due to negligence of others in the armed forces. If the serviceman sustains the injury while on furlough or leave, the result is "wholly different". Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200.

In the Feres opinion, the court states 340 U.S. at page 141, 71 S.Ct. at page 157: "We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving. Nor is there any liability 'under like circumstances' [28 U.S.C.A. § 2674, below], for no private individual has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of command. * * *", and 340 U.S. at page 142, 71 S.Ct. at page 157: "It is not without significance as to whether the Act should be construed to apply to service-connected injuries that it makes ' * * * the law of the place where the act or omission occurred' govern any consequent liability. 28 U.S.C. § 1346(b), 28 U.S.C.A. § 1346(b). This provision recognizes and assimilates into federal law the rules of substantive law of the several states, among which divergencies are notorious. This perhaps is fair enough when the claimant is not on duty or is free to choose his own habitat and thereby limit the jurisdiction in which it will be possible for federal activities to cause him injury. That his tort claims

should be governed by the law of the location where he has elected to be is just as fair when the defendant is the Government as when the defendant is a private individual. But a soldier on active duty has no such choice and must serve any place * * *. That the geography of an injury should select the law to be applied to *his* [emphasis supplied] tort claims makes no sense. * * *"

The Feres decision, supra, does not bar the claims of these plaintiffs. The relationship between the Government and a serviceman's dependents is not "distinctively federal in character", within the meaning of this decision. That the dependents are the subjects of many rules and regulations promulgated by the Army is not to be denied, nor is the fact that they enjoy privileges by reason of their relation to the serviceman. Their status, with relation to the Government, however, is completely different from his. They are not subject to the orders of superior officers, and, to paraphrase the language of the Supreme Court, they are not "serving the Government", they are not "on duty", and they are free to choose their own habitat, thereby limiting the jurisdiction in which it will be possible for federal activities to cause them injury. That their tort claims should be governed by the law of the location where they have elected to be makes sense. It does not follow that, because these dependents enjoy privileges by reason of their relation to the serviceman, their rights to sue are derived from the serviceman's status.

■■ If a member of the armed forces may recover judgment against the United States under this Act for injury not incident to his services, Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200, the dependents of such a member may recover judgment for injury sustained as a result of the negligence of an employee of the Government. The statute provides for jurisdiction over "any claim" founded on negligence brought against the Government. Congress did not list claims of servicemen's dependents among the exceptions.

Neither does the Feres decision bar the claim of the soldier father for consequential damages. Messer et al. v. United States, D.C., 95 F.Supp. 512, 513.

There is a final problem which requires discussion; whether the United States, if a private person, would be liable to the claimants in accordance with the laws of the State of Kansas.

Title 28, U.S.C.A. § 1346(b) provides: "Subject to the provisions of chapter 171 of this title, the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States * * * for * * * personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or* omission occurred." [Emphasis supplied.]

■ There is no dispute with respect to the law of Kansas concerning a denial of recovery against certain principals of tortfeasors. Charitable organizations conducting hospitals are not liable for the negligence of their physicians and attendants resulting in injury to patients, unless it is shown that the management has not exercised reasonable care in the employment of physicians and attendants. Nicholson v. Atchison, Topeka & Santa Fe Hospital Association, 97 Kan. 480, 155 P. 290, L.R.A. 1916D, 1029; Davin v. Kansas Medical, Missionary & Benevolent Association, 103 Kan. 48, 172 P. 1002; Webb v. Vought, 127 Kan. 799, 275 P. 170; Ratliffe v. Wesley Hospital & Nurses' Training School et al., 135 Kan. 306, 10 P.2d 859; Leeper v. Salvation Army, 158 Kan. 396, 147 P.2d 702. Such is the law of Kansas, for the reason that "the resources of charitable organizations are trust funds which cannot be subjected to the payment of damages in such cases." Webb v. Vought, supra, 127 Kan. 799, 275 P. at page 171.

It follows that if the Army Station Hospital at Fort Leavenworth, in November of 1947, falls within the classification of "charitable hospital", the Government is not liable to the plaintiffs. If, on the other hand, the defense of "charitable hospital" is not established, the plaintiffs are entitled to prevail.

The decisions of the Kansas courts above-noted do not contain a definition of "charitable hospital", but a thorough study of these opinions and other authorities leads me to the conclusion that the hospital with which we are concerned cannot be as classified.

Counsel have argued with respect to the characteristics of charitable hospitals, and, while I am grateful for their intelligent assistance and mindful of the great amount of research involved, a lengthy discussion of these "characteristics" would serve to confound the issue more than to resolve it. For example, the fact that a hospital requires of its patients payment for their board according to their circumstances, that no person has individually a right to demand admission to the hospital, that the trustees determine who can be received, does not render a hospital *less* a public charity. Admitting all this, these are negative notions of the legal nature of the institution. These are accidents which may characterize both charitable and noncharitable hospitals.

The determinative factor, in each case, is the *purpose* for which the particular hospital is created and exists. "A charity of course exists for the benefit of the public, [emphasis supplied] and even the fact that it receives payment for its services from its beneficiaries will not affect its character, so long as the money is used for charitable purposes and not for profit". Prosser, Torts, § 108. "The appellee * * * is a corporation organized under the laws of Kansas *for the purpose* of maintaining a benevolent and charitable institution for ministering to the indigent, sick, and wounded." [Emphasis supplied.] Ratliffe v. Wesley Hospital & Nurses' Training School et al., supra, 10 P.2d at page 859. Leeper v. Salvation Army, supra, quotes, 147 P.2d at page 703 from the

charter of the corporation: "That this corporation is organized not for profit and the *purposes for which it is formed* are to engage in charitable, educational, missionary, philanthropic and religious work * * *." "A corporation, *the object of which is to provide a general hospital for sick persons,* having no capital stock nor provision for making dividends or profits, deriving its funds mainly from public and private charity and holding them in trust for the object of sustaining the hospital, and conducting its affairs *for the purpose of administering to the comfort of the sick,* without expectation or right on the part of those immediately interested in the corporation to receive compensation for their own benefit, is a public charitable institution". 10 Am.Jur., Charities, § 135. [Emphasis supplied.]

At first blush, the Army Hospital hereinbefore described would seem to fall within the last definition of "charitable" hospital, but it does not. First, while it is true that it is not self-supporting, it does not derive its funds from public and private charity, nor does it hold such funds "in trust". It is supported by public monies, so that the reason given in Webb v. Vought, supra, for the adoption of the principle of immunity with respect to tort claims against charitable corporations is here inapplicable. Secondly, while it is true that Army Hospitals are not run for "profit" in the ordinary sense of the word, there is a gain or advantage which accrues to the Government by reason of their creation: the building and preservation of health and morale in the armed forces. Medical service which is furnished by the Army to the soldier and to his dependents "whenever practicable" serves as a compelling influence where a prospective soldier weighs the advantages of enlistment. No one who receives treatment in an Army Station Hospital, therefore, is the recipient of charity.

For the foregoing reasons, I rule that the Army Station Hospital does not fall within the category of a "charitable hospital" which would be immune from recovery under Kansas law for the negligent acts of its employees.