Luther W. WHITE, III, Administrator, c.t.a. of the Estate of Donald E. Meeks

v.

UNITED STATES of America.

Civ. A. No. 3559.

United States District Court
E. D. Virginia,
Norfolk Division.
May 22, 1962.

George H. Gray of Outland & Gray, Norfolk, Va., for plaintiff.

G. R. Patrick, Asst. U. S. Atty., Richmond, Va., for defendant.

MICHIE, District Judge.

This is an action brought by the Administrator of the estate of Donald E. Meeks to recover for the death of Donald E. Meeks which is alleged to have occurred by reason of the negligence of agents of the defendant at the Veterans Hospital in Salem, Virginia.

The defendant filed an answer denying negligence and advancing two "affirmative defenses", namely, first that the complaint failed to state a claim against the defendant upon which relief can be granted and, second, that the claim arises out of action taken in the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee.

At a pre-trial conference held on January 12, 1962, on motion of the plaintiff, the matter was set down for "argument" on the defendant's affirmative defenses on January 30, 1962 and at that time the defendant produced witnesses to prove its affirmative defenses who were heard by the court and after argument the matter was taken under advisement by the court and subsequently briefs were filed by the parties.

The court having considered the matter is of the opinion that both affirmative defenses constitute valid defenses to this action and, further, that the evidence adduced clearly shows that there was no actionable negligence on the part of the defendant unless the plaintiff can adduce evidence contradicting that produced by the defendant at the preliminary hearing.

However no motion for a summary judgment has been made and in the absence of further action by the defendant it would seem that the case should be set down for trial. If a motion for summary judgment were made it would appear to the court that the motion would have to be sustained and summary judgment entered unless the plaintiff can produce affidavits to the effect that the evidence heretofore produced by the defendant can be contradicted at the trial.

The defendant's first affirmative defense was that the complaint failed to state a claim upon which relief can be granted. It was stated at the hearing on the defendant's affirmative defenses that this position was predicated on the doctrine of nonliability of charitable hospitals which prevails in Virginia but this defense was not argued at that time or in the defendant's brief. The argument has been entirely directed to the second defense, the exemption of the discretionary function or duty from the effect of the Federal Tort Claims Act, 28 U.S.C.A. § 2680(a), which provides that the waiver of the immunity of the United States for tort claims is not to apply to "any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of * * * an employee of the Government, whether or not the discretion involved be abused."

However I am of the opinion that the first affirmative defense stated in the answer, namely, that the complaint fails to state a claim against the defendant upon which relief can be granted, is sound on the ground suggested and I will consider this defense before passing to the defense arising out of the discretionary exception.

## I.

### The Liability of Charitable Hospitals in Virginia.

■ Recovery under the Federal Tort Claims Act may be had against the United States only "in the same manner and to the same extent as a private individual under like circumstances" would be liable with certain exceptions not here material. 28 U.S.C.A. § 2674. And the liability of the private individual under

like circumstances in Virginia would of course be governed by the laws of Virginia so that it is thoroughly settled that under the Federal Tort Claims Act liability of the United States is governed by the law of the state in which the injury occurred.

In Virginia it is well settled that a hospital which is a charitable institution is not liable for the negligent acts of its employees resulting in injury to patients unless it was negligent in the selection of such employees. Weston's Adm'rx v. Hospital of St. Vincent of Paul, 131 Va. 587, 107 S.E. 785, 23 A.L.R. 907; Walker v. Memorial Hospital, 187 Va. 5, 45 S.E.2d 898; and Memorial Hospital v. Oakes, Adm'rx., 200 Va. 878, 108 S.E.2d 388 (decided in 1959).

In the latter case the court was urged to overrule the earlier cases on the ground that "the reasons for a valid public policy granting some immunity to charitable institutions no longer exist; that now the weight of authority is against any charitable immunity from tort liability, and that notable text book writers have condemned the doctrine." And it was "pointed out that Ohio, Washington, Kansas, Colorado, Delaware, New York and New Jersey are among those states which have in the past few years joined the ranks of others denying immunity to charitable institutions for their torts and those of their servants."

But the court declined to do so, saying at p. 889, 108 S.E.2d at p. 396:

"We concede that the wisdom of the rule of immunity as applied to charitable institutions is debatable. But the doctrine which was established in Weston's Adm'x v. Hospital of St. Vincent, etc., supra, is firmly embedded in the law of this Commonwealth and has become a part of the general public policy of the State. The General Assembly, though composed of many lawyers of outstanding ability throughout the years, has not seen fit to enact legislation abrogating the doctrine. By its silence, approval might well be inferred. If it be considered desirable to abolish such immunity, it would be more appropriate for the General Assembly to act, for the effect would be to operate prospectively. Abandonment of the rule by judicial decision would be retroactive and give life to tort claims not barred by the statute of limitations at the time of rendition of this opinion. It is probable that many charitable institutions, relying upon the existing doctrine, have not availed themselves of protective insurance or otherwise prepared themselves for such an event. Our reexamination of the subject convinces us that the doctrine laid down in Weston's Adm'x v. Hospital of St. Vincent, etc., supra, should not be abolished by this court, and we adhere to it."

It seems clear therefore that a charitable hospital would not be liable in Virginia under the circumstances alleged in this case and therefore, if the United States was in the Veterans Hospital operating a charitable hospital, it would not be liable for the negligence of the employees of the hospital since a private person operating such a hospital would not be so liable.

I think there is no doubt that the Veterans Hospital, though operated by the government, is a charitable institution.

"A hospital may be a public charity or a charitable institution, as may a corporation organized for the purpose of founding and maintaining a hospital. Briefly, the test which determines whether a hospital is charitable or otherwise is its purpose, that is, whether or not it is maintained for gain, profit, or advantage." 14 C.J.S. Charities § 2, p. 422.

In In re Wilson's Estate, 111 Wash. 491, 191 P. 615, a testator bequeathed "five thousand dollars to each of the following named charitable institutions * * Tuberculosis Sanitarium." There was no institution of that name but there was a city owned and operated tubercu-

losis hospital which had formerly been called the "Tuberculosis Sanitarium" and which extrinsic circumstances indicated the testator had in mind. There was also in the area a charitable institution known as the "Riverton Tuberculosis Sanitarium." The latter contended that it must have been intended as the recipient of the bequest since the bequests in the will were to "charitable institutions" and it claimed that the city-owned hospital was not a charitable institution. But the court held otherwise, saying:

"Appellant advances the argument that the city's hospital does not come within the description of the testator of a 'charitable institution,' but in this he errs, for, as already adverted to, the services performed are gratuitous, though the source of the maintaining revenue is derived from taxation. The question of whether an institution is a charitable one is determined more by its deeds than by its sustaining methods or motives. A municipality by tax-raised funds may operate a charitable institution. People ex rel. State Board of Charities v. New York Society for the Prevention of Cruelty to Children, 162 N.Y. 429, 56 N.E. 1004; Russell v. Allen, 107 U.S. 163, 2 Sup.Ct. 327, 27 L.Ed. 397; State [ex rel. Olsen] v. Board of Control of State Institutions, 85 Minn. 165, 88 N.W. 533."

In Maia's Adm'r v. Eastern State Hospital, 97 Va. 507, 34 S.E. 617, 47 L.R.A. 577, the Eastern State Hospital, which is maintained by the state for purposes quite similar to those for which the United States maintains the Veterans Hospital at Salem, was held not to be liable for the negligence of its agents and employees. But non-liability in that case was based upon the conclusion that the hospital was exercising a governmental function rather than upon its status as a charitable institution and hence it is not conclusive in the case at bar.

In Washington v. U. S., 100 Ct.Cl. 491, decided prior to the passage of the Federal Tort Claims Act, the Freedman's Hospital, operated by the United States government in Washington, D. C., was held to be a charitable hospital. In denying liability the court said:

" * * * but plaintiff says in her brief that there was implied an agreement to render her and her baby proper care, maintenance and attendance, and to deliver to her the body of her child upon her release.

"If we assume *arguendo* that plaintiff's position is correct, it is nevertheless doubtful whether it is to be implied that the hospital agreed to respond in damages for a breach of its contract, since *it was a charitable hospital operated by the United States Government*. It is the general rule that public charitable hospitals are not liable to patients for the negligence of their agents, even though the patients pay for the service rendered. Powers v. Massachusetts Homœopathic Hospital (1 C.C.A.), 109 F. 294; 13 R. C.L. 944 et seq.; and 26 Am.Jur. 594, et seq., and cases there cited. It is not to be implied that this hospital agreed to a greater degree of liability than the law imposed on public hospitals generally." Emphasis supplied.)

The purposes for which the United States maintains the Veterans Hospital at Salem are substantially the same purposes as those for which charitable hospitals, usually incorporated, are maintained and I therefore hold that the Veterans Hospital at Salem is such a charitable institution as is held to be not liable for the torts of its employees under the law of Virginia unless it has been negligent in the selection of such employees. And no such claim of negligence is made in this case.

The Federal Tort Claims Act makes the United States liable when a "private person" would be liable under like circumstances. At one time it might also have been argued that a private person would not be liable in the circumstances of this case because private persons do

not conduct charitable hospitals without incorporating and that then when the hospital is incorporated it is no longer a "private person". But any such argument seems to be foreclosed by the opinion of the United States Supreme Court in Indian Towing Co. v. U. S., 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, in which the United States was held liable for the negligence of employees of the Coast Guard who failed to keep the light in a lighthouse in order. The government's position in that case was that no private person ever kept a lighthouse and that therefore the Federal Tort Claims Act was to be construed as not imposing liability on the government for negligence of its employees in the performance of a governmental function which no private person ever performed, even if such negligence was at the operational level. But the Court held otherwise, saying at p. 69, 76 S.Ct. at p. 126:

> "The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act."

See also Rayonier, Inc. v. U. S., 352 U. S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354.

And that a business corporation, though in a sense never a private person, is a private person within the meaning of the Act is shown by numerous cases, including Carroll v. U. S., D.C., 87 F.Supp. 721, in which Judge Wyche said:

> "The words 'private person' include business corporations operating electric railways for their own use and purposes".

It would seem therefore that the words "private person" in the Act would apply to a corporation operating a charitable hospital but that, since such a private person would not, in Virginia, be liable for the negligence of its agents and employees unless it had been negligent in selecting them, the United States cannot be held liable under the Federal Tort Claims Act in similar circumstances.

I am aware that there are cases that hold otherwise or at least contain dicta to the contrary. The first such case of those that have been called to my attention is Perucki v. U. S., D.C., 76 F.Supp. 34, a case arising in Pennsylvania, where the plaintiff sued the United States on account of the alleged negligence of a Veterans Administration doctor and the court stated, on a motion to dismiss, that the Pennsylvania doctrine of the nonliability of charitable institutions was not applicable to the United States government. This case, however, was decided prior to the adoption of the Federal Tort Claims Act and is therefore not authority for actions brought under that Act which plainly makes the United States liable only when a "private person" would be liable under like circumstances.

In Grigalauskas v. U. S., D.C., 103 F.Supp. 543, a service man's baby was injured at birth, allegedly through the negligence of a doctor in an Army Hospital. The United States was held liable upon the theory that the Army Hospital was not a charitable hospital since it was not organized for a charitable purpose but for the purpose of preserving the well-being of the Army, a governmental purpose but not one which the government had undertaken for any charitable reason, the court saying at p. 551:

> "* * * Secondly, while it is true that Army Hospitals are not run for 'profit' in the ordinary sense of the word, there is a gain or advantage which accrues to the Government by reason of their creation:

the building and preservation of health and morale in the armed forces. Medical service which is furnished by the Army to the soldier and to his dependents 'whenever practicable' serves as a compelling influence where a prospective soldier weighs the advantages of enlistment. No one who receives treatment in an Army Station Hospital, therefore, is the recipient of charity."

Finally there is the case of Fulmer v. U. S., D.C., 133 F.Supp. 775, in which the court argues that the rule of nonliability of charitable hospitals should not apply to government hospitals. But in that case the court gave judgment for the defendant, the United States, on the ground that the plaintiff had failed to prove negligence on the part of the government employees. The discussion of whether or not the government might have been liable if negligence had been proved was therefore nothing but pure dictum, having no relation to anything actually decided in the case.

I conclude therefore that these cases are not really authority contrary to my conclusion that the Veterans Hospital here involved was a charitable institution, that a private person operating such an institution would not have been liable in Virginia for the torts of his employees if selected with reasonable care and that consequently, under the Federal Tort Claims Act, the United States is not liable in this case.

## II.

### The Discretionary Exception.

■ The principal argument for the defendant has been that, if any negligence is chargeable to its agents, it was negligence in the exercise of a discretionary function and that the governmental waiver of immunity under the Federal Tort Claims Act does not apply to such negligence by virtue of the express exception contained in 28 U.S.C.A. § 2680(a), providing that the provisions of the Federal Tort Claims Act should not apply to a "claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

To controvert this contention the plaintiff relies upon Fair v. U. S., 234 F.2d 288 (5th Cir., 1956) and much of the reasoning of that case seems to support plaintiff's view of the law and, indeed, to hold that the discretionary exception does not apply to negligence at the "operational level", the court saying at p. 293:

" * * * It is clear here, therefore, that based on those holdings, the discretion vested in the medical staff at Ellington Air Base under the regulations relied upon by the Government was a discretion at the operational level and that the doctors were on their own and that the defendant was liable for what they did or failed to do under established legal standards."

The Seventh Circuit seems also to have so held: American Exchange Bank of Madison, Wisconsin v. U. S., 257 F.2d 938 (7th Cir., 1958). See also Eastern Air Lines v. Union Trust Co., 221 F.2d 62 (D.C.Cir., 1955), which contains language that seems to lean in that direction. But the functions involved in those cases could hardly be fairly said to be discretionary.

On the other hand there are numerous Circuit and District Court cases holding that the exception does apply on the operational level, one case, Smart v. U. S., 207 F.2d 841 (10th Cir., 1953), involving the alleged negligent release of a mental patient, being practically on all fours with this. In that case a mentally incompetent patient in a Veterans Administration Hospital was released by the authorities, after his condition had improved, for a trial visit to his home. On the way home he stole an automobile and, while driving it negligently, injured the plaintiff who sued the United States alleging that the patient was negligently released. The court held that

the United States was not liable because of the discretionary exception in the Tort Claims Act, saying at page 843:

"In United States v. Gray, 10 Cir., 199 F.2d 239, we held that the determination whether a wife of a veteran was to be admitted to a hospital involved the exercise of discretion. By analogy the determination whether a veteran shall be released for a trial visit likewise involves the exercise of discretion.

" * * * The record is clear that the hospital authorities fully advised Dungan's parents as to their conclusions with respect to his condition and gave it as their opinion that he could be released safely for the trial visit. Whether the patient could be safely released and permitted to go on his way without an attendant likewise involved the exercise of discretion."

The Supreme Court has not passed directly on the question and there is language in some of its opinions which can be construed to lend comfort to each theory. But I feel that the defendant is clearly right and that the discretionary exception should be held to be applicable. I can find nothing in the Act to indicate that the exception is operative only at the high level planning stage and not at the operational level.

The exception exempts the United States from liability for "any claim * * based upon the exercise or performance or the failure to exercise or perform a *discretionary function or duty* on the part of * * * an *employee* of the Government, whether or not the discretion involved be abused." (Emphasis supplied.) The discretionary function or duty referred to is not limited to a high level function involving planning. It includes any discretionary function, whether involving high level planning or other high level discretionary operations or low level operations or decisions and whether involving planning or split second choices.

The history of the development of the theory that the exception is not applicable to operational decisions involving the exercise of discretion is interesting.

The first case to reach the United States Supreme Court under the Federal Tort Claims Act was Dalehite v. U. S., 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427. That case arose out of the famous Texas City Disaster. The disaster arose out of an explosion on a vessel in Texas City Harbor which was loaded with FGAN, a fertilizer produced under U. S. Government auspices which, under certain conditions, was highly explosive. The government was charged with negligence in permitting shipment of the FGAN to a congested area without definitive investigation of FGAN properties and without warning of the possibility of explosion under certain conditions. Negligence was also alleged in drafting and adopting the fertilizer export plan as a whole, in various phases of the manufacturing process, in failing to police the loading of the ships and in the methods used in fighting the fire after the explosion.

The court discussed the discretionary exception and held that it applied to exempt the government from liability for all of the acts of negligence charged, saying:

" * * * it was not contemplated that the Government should be subject to liability arising from acts of a governmental nature or function. Section 2680(a) draws this distinction.

*    *    *    *    *    *

" * * * Not only agencies of government are covered but all employees exercising discretion * * " pp. 28 and 33, 73 S.Ct. pp. 964 and 966.

And again at p. 35, 73 S.Ct. at p. 967:

"It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by

executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. * * *"

No distinction is made in the opinion of the court between negligence in high level planning and negligence at the operational level and some of the acts of negligence charged, in loading the ships and fighting the fire, seem clearly to have constituted action at the operational level.

Justices Jackson, Black and Frankfurter dissented in Dalehite and Justices Douglas and Clark took no part in the case so the decision was by a four to three vote.

The next important landmark in this field is Indian Towing Co., Inc. v. U. S., 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, another aspect of which has been discussed in Section I hereof. In this case a barge ran aground because of the failure of a light in a lighthouse maintained by the government in the Mississippi River and the Indian Towing Co., the owner of the barge, sued the United States on the ground of negligence in permitting the light to fail. The court phrased the question at issue as follows at p. 64, 76 S.Ct. at p. 124:

"The question is one of liability for negligence at what this Court has characterized the 'operational level' of governmental activity. Dalehite v. United States, 346 U.S. 15, 42, [73 S.Ct. 956, 97 L.Ed. 1427.] The Government concedes that the exception of § 2680 relieving from liability for negligent 'exercise of judgment' (which is the way the Government paraphrases a 'discretionary function' in § 2680(a)) is not involved here, *and it does not deny that the Federal Tort Claims Act does provide for liability in some situations on the 'operational level' of its activity*. But the Government contends that the language of § 2674 (and the implications of § 2680) imposing liability 'in the same manner and to the same extent as a private individual under like circumstances * * *' must be read as excluding liability in the performance of activities which private persons do not perform. Thus, there would be no liability for negligent performance of 'uniquely governmental functions.' * * *" (Emphasis supplied.)

The United States defended the case on the theory that the Federal Tort Claims Act did not intend to make the government liable for negligence in the performance of a "uniquely governmental function". The government had conceded that no exercise of discretion was involved in the case. In other words discretion was exercised by the government when it decided to put the lighthouse where it did and if it had decided not to put it there it could not have been held liable. But once it put the light there in the exercise of its discretion the employees in the lighthouse had no discretion as to whether or not it should be kept burning. And for their negligence in permitting the light to go out the government was held liable. The fact that the operation of the lighthouse was a "uniquely governmental function" was held to be no defense.

However, four members of the court, including three of the members who constituted the majority of four in the Dalehite case, dissented on the ground that "Lighthouse keeping is * * * [a] uniquely governmental function * *" and that the Federal Tort Claims Act did not intend to permit suits against the government on claims arising out of the performance of governmental functions.

We come now to the case principally relied upon by the plaintiff, Fair v. U. S. (5th Cir., 1956), 234 F.2d 288. In that case a Captain Haywood of the U. S. Air Force had threatened to kill a Miss Cooper, a student nurse at Ellington Air Force Base. Capt. Haywood was put

under psychiatric observation and Burns Detective Agency men were employed to protect Miss Cooper. The Provost Marshal promised the Burns men that he would notify them of any proposed release of Haywood. He did not do so. Haywood was released, after what the opinion refers to as a cursory psychiatric examination, and proceeded to shoot and kill Miss Cooper, the Burns men and himself. One of the Burns men's statutory beneficiaries brought suit against the United States, alleging negligence in the release of Haywood.

The Fifth Circuit had previously decided the Indian Towing case and had been reversed by the Supreme Court. The opinion in the Fair case seems to me to lean over backwards in trying to follow what the court seems to have felt (I think erroneously) were the Supreme Court's reasons for reversing it in the Indian Towing case. As we have seen the government in the Indian Towing case conceded that the negligence (in failing to keep the light in operation) did not involve the discretionary exception—since the discretion was exhausted when the government decided to establish a lighthouse there and the men in charge had no discretion as to whether or not the light should be kept burning. Yet the Fifth Circuit in the Fair case seems to have felt that the Indian Towing case held or implied that the discretionary exception was not applicable at the operational level. And it similarly read U. S. v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799, where the United States had been held liable for the negligence of employees regulating the flow of traffic at an airport. But here again, though it had been argued that the discretionary exception should apply, it does not seem really to have been involved. The nub of the holding is found in the opinion of the District of Columbia Court of Appeals (221 F.2d 62) from which the appeal to the Supreme Court was taken in which it is said at p. 78:

"It is therefore our opinion that, if a Government towerman negli-

gently clears two planes to land on the same runway at the same time, or is guilty of some other negligent act or omission in doing his work, the Government is liable for resulting injury in the same manner and for the same reason that it is liable for injury done by the driver of a mail truck who, in exercising discretion as to how to drive, negligently runs through a red traffic light."

Now obviously this statement uses the word "discretion" in an entirely different sense from the meaning intended by the Federal Tort Claims Act. The "exercise of discretion" as used in the Act obviously means that the person choosing to do a thing one way or the other has been endowed by proper authority with the right to make the choice. But no one has been endowed with the right to drive negligently through a red light. And if one does so he is not exercising discretion within the meaning of the Act. Nor is a government towerman when he negligently permits two planes to collide. He is obligated to prevent it if in any way possible and has no discretion in the matter at all. But doctors who have to decide whether it is safe to give a psychiatric patient a certain amount of freedom obviously do have to exercise their discretion in making the determination.

Obviously if "the exercise of discretion" included a deliberate decision to violate the law by running through a red light then every action at the operational level would be an exercise of discretion—discretion either to do the thing right or to do it wrong. And the government would not be liable for any act done at the operational level. But there are actions, like those of the doctors in this case, that involve a true exercise of discretion at the operational level—and there is nothing in the Act or the decision of the Supreme Court properly analyzed to indicate that the discretional exception is not applicable to them.

American Exchange Bank of Madison, Wis. v. U. S., supra, may be read two ways. In this case the United States was sued for its failure to provide a

handrail on the steps to the post office of Madison, Wisconsin, resulting in injury to the plaintiff's intestate. The court reviewed the Supreme Court cases and then said, 257 F.2d at p. 941:

> "There may still remain some immunity from liability under § 2680 (a) at the planning rather than at the operational level. * * *"

This seems clearly to imply that the exception for acts done in the exercise of discretion does not apply at the operational level. But if so the statement must be considered as mere dictum since the court goes on to hold that in any event no exercise of discretion was involved in the case, saying at p. 941:

> "Undoubtedly there was an exercise of discretion in deciding whether and where a post office building should be located in Madison, Wisconsin, but whether a handrail should be installed as a safety measure on wide stone steps involves action at the operational level and would seem to involve no more discretion than fixing a sidewalk on post office grounds that might be in need of repair."

The soundness of this conclusion may well be questioned but at any rate it shows clearly that the court was deciding the case not on the theory that the discretional exception was not applicable on the operational level but on the theory that no exercise of discretion was involved in that particular case.

Smart v. U. S., supra, holding the discretionary exception applicable under circumstances almost precisely similar to the case at bar, has already been discussed. And despite Fair v. U. S., supra, and the dicta in Eastern Air Lines v. Union Trust Co., supra, and The American Exchange Bank of Madison, Wis. v. U. S., supra, I feel the better reasoning to be with the Smart case and hold that the discretionary exception is applicable to the case at bar and that the plaintiff therefore cannot prevail on this ground as well as that discussed under Section I above.

III.

*Negligence.*

In addition to the two affirmative defenses raised by the government the answer of the government denied negligence. The hearing was not held on this point, of course, but the evidence at the hearing seems to me to have clearly demonstrated that there was no negligence on the part of the authorities.

At the hearing on the defendant's "affirmative defenses" the defendant introduced four doctors from the Veterans Hospital in Salem. Dr. Doss, the Acting Chief of Staff of the Hospital, testified that the hospital was predominantly for psychiatric treatment, both for acute and long-term cases. The operation is a large one consisting of 300 acres of land and only eight guards are employed, principally for safeguarding the plant though they, like everyone else in the hospital, on their rounds will report anything extraordinary.

The patients are classified with respect to their apparent mental condition. Some are locked up, some have a privileged status and are free to come and go and others have a semi-privileged status. Classification is actually made by a board of physicians and patients can be, and frequently are, transferred from one status to another.

Dr. Doss knew the deceased Meeks and had consulted with him on numerous occasions. The doctors knew that Meeks had previously made, or pretended to make, attempts on his life. But he did not appear to have suicidal tendencies at any time he was in the hospital although on one occasion there was a feeling that he might have such tendencies and he was placed on observation for some time. One of the suicidal attempts was when he was seventeen years old and three were years later while he was in service in the Philippines during World War II. But these latter "attempts" were considered as "gestures" rather than genuine attempts.

Meeks had previously been in the Veterans Hospital four times, the first for

a brief period in June of 1948 when he left against the advice of the doctors. The second time was for several months in 1951 when he left A.W.O.L. The third time was for about four months in 1952 when he was discharged cured or at any rate well enough to be out of the hospital. The fourth time was from April 22, 1959 to August 10, 1959 when he was again discharged to go home. But shortly after he went to his home on the Lower Peninsula he went to the nearby Kecoughtan Veterans Hospital from where he was returned to the Salem Hospital on August 27th. He was placed in the locked section and on August 29th was transferred to an observation status where he was under constant observation. On September 10th he was removed from observation status and given privileged status and on October 10th he was found dead on a railroad track near the hospital, having been killed by a passing train either by accident or suicide.

Dr. Crow admitted Meeks to the hospital on his final return and testified that he showed some slowing of his regular activity, had leg trouble and had difficulty with sleeping. He was therefore given thorazine which helps sleeping and tends to control delusional thinking. He was placed on a privileged status on September 15th by Dr. Crow in conjunction with a colleague as he seemed to be making progress. He was transferred to Ward 75 on September 29th as a privileged patient. Dr. Crow was in constant touch with the patient after his final return and never observed any suicidal tendencies.

Dr. W. R. Parks testified that he was on the psychiatric staff of the hospital in charge of Ward 75, that Meeks was sent to that ward on September 29th on a fully privileged status and that he, Dr. Parks, did not change that status as he saw no reason to change it. Meeks appeared to be able to take care of himself, was coherent and had good judgment. He saw him daily Monday through Friday and had three private interviews with him which was normal under the circumstances.

On October 9th Meeks came to Dr. Parks' office and said he felt uneasy and tense and asked for more medicine. This is a common occurrence and did not alarm Dr. Parks. Meeks had been making satisfactory progress and did not appear to be suicidal. Dr. Parks gave him thorazine on this occasion.

Dr. Krowgey testified that he saw Meeks on his regular round on October 10th. He was complaining of apprehension and nervousness that morning. Dr. Krowgey checked his chart and ordered more thorazine for him. He could have placed him on observation status but he did not feel that there was any reason to do so. A nurse called him later and said that Meeks was still nervous and Dr. Krowgey ordered more medicine for him.

Of course, as this hearing was simply on the sufficiency in law of the defendant's so-called affirmative defenses, the plaintiff had no occasion to put on any evidence. But from the testimony adduced by the defendant it does not appear that there was any negligence on the part of any of the doctors or other employees of the Hospital.

Unless the plaintiff should file affidavits to the effect that he can contradict the evidence adduced at the hearing with respect to negligence or prove that there was negligence somewhere involved with respect to matters as to which no testimony has been taken, it would appear that the government would also be entitled to summary judgment on the ground that the evidence at the hearing had demonstrated that no negligence was involved in the case.

IV.

*Conclusion.*

If the government is advised to file a motion for summary judgment on any or all of the grounds above discussed in sections I, II or III hereof it will be granted on such ground or grounds unless, as above indicated, counter-affidavits

can be filed with respect to negligence in which event summary judgment will be granted only on the ground or grounds discussed in sections I and II hereof. If no such motion is filed the case will be set down for trial.